[702 NYS2d 5]

Omar Alvarez et al., Appellants, v Leslie C. Snyder et al., Respondents, et al., Defendants.

First Department, January 13, 2000

### APPEARANCES OF COUNSEL

*Eugene B. Nathanson* (*Malvina Nathanson* on the brief), attorney, for appellants.

*Rebecca Ann Durden* of counsel (*Michael S. Belohlavek* on the brief; *Eliot Spitzer, Attorney General* of the State of New York, attorney), for Leslie C. Snyder, respondent.

*David Henry Sculnick* of counsel (*Gordon & Silber, P. C.,* attorneys), for Hillel Bodek, respondent.

### OPINION OF THE COURT

TOM, J.

Plaintiffs appeal from a Supreme Court order dismissing their complaint seeking damages for alleged violation of their constitutional rights, including freedom of association and speech and deprivation of liberty without due process as detainees in a criminal proceeding.

This is a 42 USC § 1983 action in which plaintiffs seek compensatory and punitive damages and certain injunctive relief. The claims of several plaintiffs generally arose during their status as pretrial detainees in the custody of the New York City Department of Correction. Two plaintiffs, who were not detained, are the mothers of two of these detainees. The defendants are the Justice presiding over the criminal trial of the detainee plaintiffs, whose orders affected the terms of their confinement, and a social worker retained and working at her behest with regard to supervision of the terms of plaintiffs' confinement.

Plaintiffs and others were arrested in connection with investigations into the activities of three criminal gangs: the Yellow Top Crew, also known as "Talented Young Children," the Purple Top Crew, and the Red Top Crew, also known as "Natural Born Killers." Over 100 individuals were charged with a variety of offenses, including murder and attempted murder, conspiracy, and weapons and drug offenses. These indictments resulted in numerous related prosecutions. Some indictees were willing to cooperate with law enforcement

authorities, likely necessitating their testimony at multiple trials. The physical safety of cooperating witnesses became a primary concern of prosecutors and Justice Leslie Snyder, defendant herein, to whom the cases were assigned. The first trial, scheduled to follow Labor Day 1995, involved members of the Yellow Top Crew. The trial was expected to last four months.

In anticipation of problems arising from the sheer scale of these prosecutions and the need to ensure the safety of witnesses, some of whom might have been incarcerated along with various criminal defendants, the court appointed Hillel Bodek, a certified social worker, in August 1995 to act as a special master. Bodek's responsibilities were logistical as well as security related. The logistical responsibilities involved arranging for those defendants' viewing of discovery material, ensuring speedy in camera review of documents if necessary, keeping the criminal defendants' daily appearances on track, ensuring that necessary personal services, such as laundry and the like, were provided in a timely fashion to defendants throughout trial, and crafting a mechanism to handle potential health problems arising during the lengthy trial. The goal was to keep proceedings on track without undue or punitive inconvenience to the defendants. Apparently, procedures were effectively implemented and, in fact, acted upon, so that the Yellow Top defendants, whose trial was imminent, got to review discovery material, transportation was coordinated among City and State custodial facilities and those prisoners' medical needs were anticipated.

Bodek's security role, though, was intended to protect others from defendants as much as individual defendants from others. As initially understood, Bodek's instructions from the court were focused on two matters. A peculiar dynamic of the gangs and activities involved in the prosecution resulted from the fierce rivalry among many of the gang indictees, many of whom had tried killing one another in the course of a criminal trade that was particularly violent, warranting the reasonable concern that additional measures would be necessary to maintain separation among potential enemies. Moreover, cooperating witnesses or their attorneys had communicated security concerns to the prosecutor and the court, also warranting as a general matter special logistical measures to ensure their safety, especially for incarcerated cooperators. An Assistant District Attorney, not part of the prosecution team, was designated a liaison with Bodek and the court on security issues.

During early September 1995, information about specific threats by Yellow Top defendants against witnesses and their families residing in the community were relayed by prosecutors to Bodek. This specific information included criminal defendant (plaintiff in the present civil action) Pedro Diaz's attempt to hire a contract killer, arranged through an identified incarcerated intermediary, to kill a nonincarcerated witness. The intermediary, who was an informant, was asked to arrange the putative killer's visitation with Diaz in prison; instead, an undercover officer arrived and the conversation with Diaz was taped.

On September 6, prior to the commencement of trial, two of the six Yellow Top defendants pleaded guilty. Justice Snyder, at an in camera proceeding, received information and evaluated how to proceed regarding protection of witnesses from the remaining criminal defendants. By sealed order implemented September 8, she imposed a "lock down" directing that defendants Alvarez, Ayala, Diaz and Springer be denied visitation and telephone use, except for attorney communications for which special arrangements were made requiring verification that an attorney, in fact, was being phoned. Alvarez and Ayala, both of whom had already slashed other inmates, were to be strip-searched and their cells and property searched daily. The court also provided specific instructions regarding the time and manner in which the defendants would be transported, that they would be restrained by handcuffs and leg irons at such times, and were to be strip-searched upon leaving and upon their return to prison. They were then moved to Riker's North Infirmary Command building, a relocation they challenge as violating unspecified correction regulations.

Bodek also was informed that the defendants were passing notes and other messages to inmates in court detention pens threatening cooperating witnesses. This led to a modification of Justice Snyder's order on September 18. As a consequence, after consultation with postal officials, the defendants' outgoing mail was intercepted and screened, by Bodek, for threats prior to being deposited with the Postal Service. Incoming mail was not subject to interception. If information within required judicial intervention, Bodek was directed to contact another designated Justice, uninvolved in the trial, and Bodek was barred from discussing any such information with the prosecutors. However, at the same time, and at Bodek's recommendation, Justice Snyder's order allowed the detainees more recreational opportunities, subject to certain restrictions.

On October 4, Springer indicated an intention to plead guilty, and he was allowed family visitation. He pleaded guilty the following day, and was sentenced on October 31 and immediately transferred to State custody. This left only Ayala, Diaz and Alvarez in the Yellow Top case. Ayala and Alvarez were each allowed two supervised family visits in December. They were convicted on January 6, 1996, and were sentenced on January 30, 1996 and remanded to State custody. Alvarez, Diaz and Springer are plaintiffs in the present civil action.

Victor Ocasio, reputed leader of the Purple Top gang, also is a civil plaintiff. During mid-September 1995, prosecutors relayed information that Ocasio had threatened the above-mentioned informant (whose tape recording had been disclosed to counsel in the Yellow Top trial). Inmates also heard Ocasio refer to a Yellow Top leader, Martin Mejias, as a "snitch," after which Mejias was transferred to another facility for his own protection. Additional information about Ocasio's threats to other witnesses was verified. By contrast, information that Edgardo Pabon, another Purple Top leader, had made threats could not be verified and additional restrictions were not imposed on him.

The September 29, 1995 sealed order imposed on Ocasio the restrictions already imposed on the Yellow Top defendants. The order was relayed to correction officials, who were told that Ocasio could still have telephone access to his attorney, subject to verification of his attorney's phone number to ensure that a subterfuge call was not going to be placed to another party. Ocasio also would be permitted attorney visits upon receipt by correction officials of the attorney's name. When the telephone restrictions were communicated to Ocasio, and he also was informed that his attorney could not be reached, Ocasio himself expressed frustration that his attorney had missed several court appearances, and evinced an intention to proceed *pro se*. Subsequently, counsel indicated that he had been away until October 11, but that Ocasio had managed to telephone him and advise him of the restrictions. There is no indication that attorney-client communications were impeded during this time period. Although Ocasio's outgoing mail was to be screened, the order specifically provided that his incoming mail would not be affected, nor did it affect mail addressed to counsel. Apparently, only eight letters were intercepted, six of which were forwarded after screening, and two of which lacked postage. No mail to counsel was intercepted. Ocasio also was informed by Bodek on multiple occasions that if he wished

visitation, he should identify the proposed visitor, describe his relationship with him or her, and advise Bodek how to contact that person so that a security clearance could be obtained. After initially demurring that he had not had prior visits and did not anticipate future visitors, Ocasio eventually asked generically whether he could be visited. Each time, Bodek requested the necessary information for visitation, but Ocasio never provided further specifications regarding possible visitors.

During this entire time period, Bodek regularly visited these plaintiffs while in custody, and told them that any complaints about custodial arrangements or treatment by correction officials could be communicated to Bodek directly or through their attorneys. All of these plaintiffs at all relevant times were represented by counsel. There is no substantiated instance when communications between counsel and client were impeded. No Department of Correction regulations are directly referenced in the complaint that are claimed to have been violated by either Bodek or Justice Snyder. Nor, except for Ocasio's apparently unsuccessful petition for a writ of habeas corpus (not included in the record), had any plaintiff sought CPLR article 78 relief seeking to vacate the orders as exercises of power beyond the scope of valid judicial authority.

The plaintiffs, including Alvarez's and Ocasio's respective mothers, filed the present complaint in October 1996 seeking punitive and compensatory damages from the individual defendants personally. Curiously, it is unverified. The complaint advances four causes of action, sounding in various New York and Federal constitutional and common-law tort theories, under the aegis of 42 USC § 1983: interference with plaintiffs' freedom of association and speech, including the right to maintain family and social relationships; unreasonable searches and seizures; violation of due process; battery; and false imprisonment. The general thrust of the complaint is that the lock-down orders were issued on the basis of ex parte information, without according the detainee plaintiffs an opportunity to be heard, and that the restrictions imposed were not reasonably related to the underlying reasons provided for the restrictions. For instance, plaintiffs allege that there was no evidence that they used telephones or the mails to intimidate witnesses, or that threats were conveyed through family members or other persons not in custody. They claim too that each plaintiff was kept incommunicado from counsel for a week following the initial imposition of restrictions, and that outgoing mail, much allegedly never received by addressees, was

interfered with. These unverified, and largely unsupported, claims would be easily refuted by Bodek's affidavit. Plaintiffs also complain about restrictions on recreation and on having to eat in their cells. They also complain that Department of Correction regulations—never specified—exclusively govern changes in detainees' housing categories. Basically, plaintiffs allege that Snyder and Bodek arrogated to themselves authority which properly belonged to the Department of Correction by relaxing or restricting plaintiffs' conditions of confinement based on these civil defendants' evaluations of plaintiffs' behavior. In this latter regard, the complaint profiles what really is the core issue for our determination: whether Justice Snyder, and by delegation Bodek, acted under color of judicial authority, or acted entirely ultra vires, as individual persons, so that they would not be immunized from challenges seeking to impose personal liability.

Affirmative defenses were interposed, generally arguing that defendants enjoyed judicial and quasi-judicial immunity for conduct undertaken in such capacities, that the complaint failed to set forth cognizable causes of action, that the claims were barred by the applicable Statute of Limitations, that plaintiffs failed to exhaust other appropriate remedies, and that the maternal plaintiffs were not aggrieved persons entitled to relief. Defendants moved to dismiss for lack of subject matter jurisdiction and the complaint's failure to state a cause of action.

The IAS Court, rejecting plaintiffs' formulation that Justice Snyder acted as "jailor" rather than as a Judge, found her not to be a "person" within purview of 42 USC § 1983, allowing actions against individuals who, acting under color of State law, interfere with Federal rights. The court found that the criminal proceeding conferred jurisdiction, that the challenged orders arose from information received in the context of that proceeding, and that the challenged acts were undertaken to ensure the efficient and proper administration of justice, especially in view of the overriding concern for the protection of witnesses from the actions of certain of the plaintiffs. We agree that the complaints should be dismissed.

The dispositive ground for dismissal is that the complaint fails to breach the shield of immunity protecting Justice Snyder, and by delegation Bodek, from personal liability for their actions falling well within the scope of appropriate judicial duties, especially for actions ensuring the integrity of court proceedings, under the facts of this case.

A section 1983 claim alleges that an individual acting under color of State law deprived the claimant of a Federal right (*Gomez v Toledo*, 446 US 635, 640). However, various judicially created exceptions may bar a claimant's statutory right to relief (*Gomez v Toledo, supra*). The exception presently applicable is that of judicial immunity. The Second Circuit has stated that "[j]udicial immunity is by now a well-established doctrine. * * * A judge defending against a section 1983 suit is entitled to absolute immunity from damages for actions performed in his judicial capacity. * * * Moreover, '[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction" ' [citation omitted]" (*Fields v Soloff*, 920 F2d 1114, 1119). Moreover, "[l]iability will not attach where a judge violated state law by an incorrect decision" (*supra,* at 1119). It has long been recognized that "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction" (*Pierson v Ray*, 386 US 547, 553-554, citing to adoption of doctrine in *Bradley v Fisher*, 13 Wall [80 US] 335; *accord, Mireles v Waco*, 502 US 9), a common-law protection long recognized to extend specifically to actions brought under 42 USC § 1983 (*Zuckerman v Appellate Div.*, 421 F2d 625, 626, n 2, citing *Pierson v Ray, supra*, at 554). The goal is not to benefit the Judge, but to protect the public on whose benefit the Judge acts; that benefit is to secure a Judge's ability to act independently without fear of personal consequences (*Pierson v Ray, supra*, at 554).

As with other forms of immunity, "judicial immunity is an immunity from suit, not just from ultimate assessment of damages" (*Mireles v Waco, supra*, at 11; *see, Mitchell v Forsyth*, 472 US 511, 526). Only two exceptions to the doctrine are recognized: when a Judge does not act as a Judge, or when a Judge, though acting under color of judicial authority, lacks any jurisdiction supporting judicial authority for the action taken (*Mireles v Waco, supra*, at 11-12; *Pierson v Ray, supra*). Neither exception applies in this case.

Plaintiffs contend that Justice Snyder did not act as a Judge, but as a "jailor," an administrator of the Department of Correction. The assertion is spurious. Justice Snyder acted in her judicial capacity (*compare, Forrester v White*, 484 US 219 [Judge, firing probation officer, acted as administrative authority rather than in judicial capacity]; *see, Matter of People v*

*Little*, 89 Misc 2d 742 [court had inherent power to direct County Treasurer to pay stenographer so that transcripts could be prepared for appellate purposes]). The only relevant question is whether she did so in the absence of any jurisdictional predicate for her orders. For this analysis, there is a critical distinction between jurisdiction and authority (*Mireles v Waco*, *supra*), and jurisdiction, for these purposes, is to be broadly construed (*Stump v Sparkman*, 435 US 349, 355-356). Even if she exceeded her authority, or acted maliciously or in retribution, as plaintiffs contend (*Stump v Sparkman*, *supra*, at 356; *Gutierrez v Vergari*, 499 F Supp 1040, 1046), personal liability does not attach unless she acted in the clear absence of all jurisdiction (*Mireles v Waco*, *supra*, at 12; *Stump v Sparkman*, *supra*, at 356-357; *Fields v Soloff*, *supra*, at 1119). Notably, the challenged orders in this case were issued in the context of a pending criminal proceeding, and affected persons who were parties to the proceeding (*Gutierrez v Vergari*, *supra*, at 1046).

The IAS Court, in dismissing, properly relied on a court's inherent jurisdiction "to do all things reasonably necessary to enable it to administer justice effectively." The general principle that courts inherently may do that which is necessary to ensure the integrity of the proceedings over which they preside has been long recognized in New York (*People v Green*, 170 Misc 2d 519, 523-524, and citations therein). Inherent power, by its nature, does not derive from express statutory authority, but is governed by the need to reasonably enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective (*Gabrelian v Gabrelian*, 108 AD2d 445, 448, *appeal dismissed* 66 NY2d 741, overruled in part by *Matter of A. G. Ship Maintenance Corp. v Lezak*, 69 NY2d 1; *People v Green*, *supra*). Inherent power is a recognized adjunct to judicial power when a Judge must discharge a responsibility, but lacks guidance from explicit legislative or decisional authority. Especially in such "gray area situations", the exercise of inherent authority derives from common-law tradition as a means "to fill the gaps of express law and to respond to problems * * * that come up in carrying out their adjudicative duties * * * to fashion rules and create procedure so that the adjudicative process can function" (Stumpf, *Inherent Power of the Court*, National Judicial College, at 37 [1994]). The Federal District Court, in dismissing Ocasio's Federal complaint, took into account New York's historic application of the doctrine of inherent judicial power, and characterized Justice Snyder's orders

as "an exercise of binding judicial authority" (*Ocasio v Jacobson*, 1996 US Dist LEXIS 1602, * 11, 1996 WL 66112, 4 [SD NY, Feb. 15, 1996, Stein, J.]).

In the present case, when reliable information alerted the court presiding over the criminal trial of detainees regarding their direct interference with the administration of that trial, the court's adjudicative duties included the exercise of its inherent power to ensure that the interference end, providing a jurisdictional basis for the court's orders. Since the court acted on a judicial jurisdictional basis, the Trial Justice enjoys immunity protecting her from personal liability as a consequence of those judicial actions. We disagree with the concurrence that these plaintiffs lacked recourse to challenge those orders—they simply failed to avail themselves of article 78 relief.

The measures taken, of course, must be rationally related to the nature of the interference as a minimal condition for the viability of any jurisdiction. Since we find a jurisdictional basis for the orders, the question of whether the measures are also proportionate in every regard, which plaintiffs contend is a core issue, becomes academic, unless the disparity between the problem addressed and the remedy employed is so stark, and so unbridgeable, that the court cannot rationally be said to have validly exercised inherent power. Here, too, plaintiffs fail to defeat Justice Snyder's claim to immunity. In this case, plaintiffs' interference consisted of threats and potential murder in a complex and expansive prosecution, arguably escalating the degree of judicial oversight permissible to neutralize the acts of these very detainees. The measures taken in this case, restricting these particular detainees' demonstrated ability, despite being in Correction custody, to communicate those threats, or to solicit the services of other inmates or outside parties to perpetrate assaults or homicides, or to physically carry out assaults personally, were rationally related to the threats posed by these detainees. The record reflects that the measures were not undertaken for punitive purposes, or as discipline for detainment infractions, but, rather, were specifically designed, based on the urgency of the situation, to accomplish the court's stated objective of preventing plaintiffs' imminent interference with the orderly trial of their cases. The measures taken by the court clearly do not overstep the immunity conferred on Justice Snyder in this action seeking personal damages.

Parenthetically, the question of rationality is closely linked to the traditional due process analysis. However, under these

circumstances, there are no constitutional violations. Prohibiting visitation for pretrial detainees (*Block v Rutherford*, 468 US 576; *cf.*, *Cooper v Morin*, 49 NY2d 69, *cert denied sub nom. Lombard v Cooper*, 446 US 984), modest interference with attorney-client communications (*Pino v Dalsheim*, 558 F Supp 673), subjecting outgoing mail to inspections to prevent threats to security (*United States v Williams*, 951 F2d 853, 855; *Smith v Delo*, 995 F2d 827, 830-831, *cert denied* 510 US 1052; *Purnell v Lord*, 952 F2d 679, 680) and strip searches related to legitimate security concerns (*Block v Rutherford, supra*; *Hudson v Palmer*, 468 US 517; *Bell v Wolfish*, 441 US 520) have all been found, under Federal constitutional analysis, to constitute valid nonpunitive remedial measures reasonably related, under appropriate circumstances, to the governmental objective of ensuring prison security. So too, here. Even employing the more protective New York due process standard, balancing the restrictions' impact on the detainee against the needs for prison security or the orderly administration of justice (*Cooper v Morin, supra*, at 79-80), these measures pass muster. Hence, even if we were to reach the constitutional claims, we would reject them.

Since Justice Snyder enjoys absolute immunity, the inquiry turns to whether Bodek enjoys quasijudicial immunity for his conduct as special master in carrying out her orders. As a general principle, immunity extends to "individual employees who assist [the official absolutely privileged] and who act under that official's direction in performing functions closely tied to the judicial process" (*Hill v City of New York*, 45 F3d 653, 660). Courts, in evaluating whether a person is thus immunized, focus on the nature of the claimant's function, rather than on who he or she is or how it impacts the complainant (*Buckley v Fitzsimmons*, 509 US 259, 271; *cf.*, *Forrester v White*, 484 US 219, 229, *supra*). Plaintiffs, arguing the absence of immunity for Justice Snyder, preliminarily argue for no greater basis to immunize Bodek, a point we have already rejected. They further contend that, to whatever extent Bodek acted on valid orders, he exceeded the authority conferred by those orders and is thus personally exposed to them for the harms they suffered.

Initially, the record makes clear that Bodek's authority, and his exercise of such, expanded incrementally in tandem with the exacerbation of dangerous conduct by the detainee plaintiffs, and at all times was under the aegis of Justice Snyder's orders. Moreover, although Bodek's role was not one typi-

cally conferring immunity on social workers (*see, e.g.*, *Weitzner v New York City Dept. of Social Servs.*, 212 AD2d 414; *Finkelstein v Bodek*, 131 AD2d 337, *lv denied* 70 NY2d 612; *Schanbarger v Kellogg*, 35 AD2d 902, *cert denied* 405 US 919), in his role as a judicially appointed special master, there is no sound basis on which his entitlement to immunity should be abridged because of that status. Furthermore, as a general proposition, error, by itself, does not deprive the claimant of an immunity otherwise proper (*Mon v City of New York*, 78 NY2d 309; *Weitzner v New York City Dept. of Social Servs.*, *supra*) so that even an inadvertent misconstruction of his authority would not make him liable for accomplishing the court's stated goals. In any event, Bodek always synchronized his recommendations and actions with the court's directives and, rather than acting arbitrarily, was always responsive to the circumstances created by the detainee plaintiffs. In contrast to Bodek's affidavit establishing a carefully modulated escalation and de-escalation of various restrictions pertinent to outstanding security concerns, plaintiffs allege in an entirely conclusory manner that Bodek's acts were retaliation for their assertion of constitutional and statutory rights. The equally conclusory unverified complaint fails to support the contention to any extent.

Accordingly, the order, Supreme Court, Bronx County (Douglas McKeon, J.), entered on or about April 5, 1999, giving effect to the decision dated July 8, 1997, dismissing the complaint against Justice Snyder, and order, same court and Justice, entered August 24, 1998, which, *inter alia*, dismissed the complaint against Bodek and denied plaintiffs' motion for renewal of the prior order dismissing the complaint against Justice Snyder, and order, same court and Justice, entered August 31, 1998, granting reargument of the July 8, 1997 decision dismissing the complaint against Justice Snyder and, upon reargument, adhering to that prior decision, should be affirmed, without costs.

SAXE, J. (concurring). I concur in the conclusion that this 42 USC § 1983 action must be dismissed as against defendant Judge and her agent, based upon judicial immunity, since it cannot be concluded that the Judge acted in the clear absence of all jurisdiction. "A judge will not be deprived of immunity because the action he took was in error * * * or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction'" (*Stump v Sparkman*, 435 US 349, 356-357, quoting *Bradley v Fisher*, 13 Wall [80 US] 335, 351).

There is an important distinction between acting in "clear absence of all jurisdiction" and issuing an order without the authority to do so. The distinction is illustrated by the United States Supreme Court in *Stump v Sparkman* ( 435 US, *supra*, at 357, n 7): "if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune."

In accordance with the above-cited explanation, the Court subsequently held that judicial immunity protected a Judge from liability under 42 USC § 1983 even in the face of allegations that the Judge had ordered police officers to seize a particular public defender, who had not appeared on the initial call of the Judge's calendar, and that the officers used excessive force to bring the attorney into the Judge's courtroom (*see, Mireles v Waco*, 502 US 9). The Court remarked, "If [the judge] authorized and ratified the police officers' use of excessive force, he acted *in excess of his authority*. But such an action—taken in the very aid of the judge's jurisdiction over a matter before him—cannot be said to have been taken in the absence of jurisdiction" (502 US 9, 13 [emphasis added]).

With the foregoing in mind, it is apparent that the Judge's actions in the present case fall within the types of conduct protected by judicial immunity: they were "judicial" acts and did not fall outside the area of her subject matter jurisdiction (*see, Stump v Sparkman, supra*, at 356, 360). However, I am unable to accede to the implication of the majority and the IAS Court that the ex parte orders issued by the defendant Judge with regard to the plaintiffs' conditions of confinement were authorized by the inherent powers of the court. To that extent, I do not join in with the majority.

Without a hearing, based upon ex parte allegations, the defendant Judge issued "lock-down" orders imposing severe restrictions on the detainees' conditions of confinement, including denial of visitors and phone calls, 23-hours-a-day cell confinement, and restraint by handcuffs, leg irons and waist chains when permitted out of their cells. The majority seems to conclude that the Judge's orders were permitted by the court's "inherent powers," asserting that "when reliable information alerted the court presiding over the criminal trial of detainees regarding their direct interference with the administration of

that trial, *the court's adjudicative duties included the exercise of its inherent power to ensure that the interference end"* (emphasis added). This is a broad statement of authority; I believe it is too broad.

The "inherent powers doctrine" has been relied upon to support a court's authority to adopt procedural rules; this includes such matters as the assignment of cases (*see, People v Granatelli*, 108 Misc 2d 1009, 1018; *Bankers Trust Co. v Braten*, 101 Misc 2d 227, 235-236), general calendar control (*see, Travelers Ins. Co. v New York Yankees*, 102 AD2d 851, 852), the granting of preferences (*see, Plachte v Bancroft Inc.*, 3 AD2d 437, 438), and the promulgation of rules of practice (*see, Hanna v Mitchell*, 202 App Div 504, *affd* 235 NY 534). But, while the Second Department interpreted the "inherent powers" doctrine more expansively, so as to authorize courts to impose a monetary sanction against a litigant or attorney who engaged in abusive litigation practices (*see, Gabrelian v Gabrelian*, 108 AD2d 445, *appeal dismissed* 66 NY2d 741), its reasoning was subsequently limited by *Matter of A. G. Ship Maintenance Corp. v Lezak* (69 NY2d 1, 6). In *A. G. Ship Maintenance*, the Court of Appeals remarked that since the problem of abusive litigation practices was most effectively dealt with by plenary rule rather than by ad hoc judicial decision, sanctions could not be imposed in the absence of court rule or statute.

There is nothing in the development or the prior use of the doctrine of "inherent powers" that would support its extension beyond matters of court procedures, into the area of the rights and liberties to be permitted to an individual in the custody of the Department of Correction.

Moreover, the inherent judicial power is appropriate only when the problem addressed is not subject to legislative control (*see, Matter of A. G. Ship Maintenance Corp. v Lezak*, 69 NY2d, *supra*, at 6). The matter of punitive confinement of detainees, in contrast, is an area firmly and fully subject to plenary legislative regulation; indeed, numerous regulations address the subject in detail, and provide procedures for circumstances in which there is reason to believe an inmate has engaged in unlawful conduct (*see, e.g.*, 7 NYCRR 250.1 *et seq.*; 9 NYCRR 7006.1 *et seq.*). These regulations dictate detailed procedures to be followed by the Department of Correction where it appears that an individual in custody requires additional restrictive measures. The procedures include a speedy hearing (see, 7 NYCRR 252.3, 253.6, 254.6; 9 NYCRR 7006.8), an appeal process (7 NYCRR 252.6, 253.8, 254.8; 9 NYCRR 7006.10) and

established parameters for permissible disciplinary measures (7 NYCRR 252.5, 253.7, 254.7; 9 NYCRR 7006.9). Since the area of punitive confinement of inmates is fully addressed by established rules and regulations, application of the doctrine of inherent judicial power is inappropriate under the circumstances.

The focus and purpose of imposing such standard procedures on the Department of Correction is to protect against the possibility of arbitrary or disproportionate disciplinary measures. That very danger arose by the actions of the Trial Judge here. "Because inherent powers are not subject to direct democratic controls, they must be invoked with great restraint, as there is a danger that such powers may be wielded arbitrarily or in doubtful cases" (*Gabrelian v Gabrelian*, 108 AD2d, *supra,* at 454; *see also,* concurring opn of Lazer, J., *supra*, at 455-464). Furthermore, such protections comport with a fundamental tenet of our criminal justice system, which entitles the accused to certain basic safeguards, including the right to notice of the charges, the opportunity to be heard and the right to review (*see, e.g.*, CPL 210.15, 210.20).

If reliance is placed upon a court's "inherent powers," a Trial Judge would be permitted to bypass the obligation to provide the accused with any automatic procedural protections. Indeed, this case serves to illustrate the danger recognized in *Gabrelian* (*supra*), namely, that the doctrine, when used in a context other than the adoption of court procedures, creates a danger that the power may be wielded in an arbitrary manner. Not only was there no formal recourse by which the detainees could seek direct review of the ex parte orders, but, indeed, it was unclear what paths were available to challenge the Judge's orders (*see generally*, *Ocasio v Jacobson*, 1996 US Dist Lexis 1602, *16-17, 1996 WL 66112, 6 [SD NY, Feb. 15, 1996, Stein, J.]).

While there are certainly circumstances in which it is appropriate to justify judicial actions by invoking the inherent powers of the courts, such a justification should be invoked sparingly, and only when clearly necessary and appropriate. Where procedures exist for handling the type of allegations at issue, such procedures should be employed, rather than issuing *sui generis* orders based solely upon ex parte communications. Here, there was every reason to defer to the expertise of the correctional system regarding conditions of confinement for criminal defendants (*Bell v Wolfish*, 441 US 520, 548).

SULLIVAN, J. P., RUBIN and BUCKLEY, JJ., concur with TOM, J.; SAXE, J., concurs in a separate opinion.

Orders, Supreme Court, Bronx County, entered on or about April 5, 1999, August 24, 1998 and August 31, 1998, affirmed, without costs or disbursements.