[854 NYS2d 362]

In the Matter of Jovan Fludd, Petitioner, v Arlene Goldberg et al., Respondents.

First Department, March 18, 2008

APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Jennifer Eisenberg* and *Rosemary Herbert* of counsel), for petitioner.

*Andrew M. Cuomo, Attorney General*, New York City (*Monica A. Connell* of counsel), for Hon. Arlene Goldberg and others, respondents.

*Robert M. Morgenthau, District Attorney*, New York City (*Daniel G. Cort* of counsel), for Robert M. Morgenthau, respondent.

## OPINION OF THE COURT

CATTERSON, J.

The question raised by this CPLR article 78 proceeding is whether a trial court has "inherent power" to issue orders authorizing the Department of Correctional Services (hereinafter referred to as DOCS) to place an inmate in solitary confinement once the criminal proceeding has terminated by entry of judgment.

The criminal prosecution underlying this proceeding was commenced against petitioner Jovan Fludd in May 2005. The petitioner was charged with several counts of forgery on the grounds that he filed a series of false liens under article 1 of the Uniform Commercial Code. The petitioner filed the liens while he was incarcerated for a separate offense.[1] The targets of the liens were New York County prosecutors and judges involved in the prosecution of the petitioner's earlier offense.

On May 19, 2005, the petitioner was produced from state prison and arraigned on the false UCC-1 filings indictment. At the arraignment, the court issued an order prohibiting the petitioner from filing UCC-1 statements or any other specified Uniform Commercial Code forms, or civil litigation (except habeas corpus petitions) without leave of the court, and further limited his ability to make telephone calls, send letters, give materials to visitors, and obtain funds from his commissary account. The order also provided for the appointment of a Special Master to monitor the petitioner's correspondence. The order, by its terms, was to remain in effect during the pendency of the criminal case. On January 20, 2006, the petitioner was convicted

---

1. On April 29, 2004, the petitioner was sentenced to 2½ to 5 years after pleading guilty to forgery in the second degree in violation of Penal Law § 170.10 (3).

of three counts of offering a false instrument for filing in the first degree (Penal Law § 175.35), three counts of falsifying business records in the first degree (Penal Law § 175.10), and one count of obstructing governmental administration in the second degree (Penal Law § 195.05).

After the petitioner's conviction, and prior to sentencing, the People sought a subsequent order continuing the specific terms of his incarceration because it was "*likely* that the defendant [would] continue to engage in his criminal scheme" (emphasis added). On March 13, 2006, the respondent Justice granted the People's request. Specifically, she announced that she would continue the substance and directives of the May 2005 pretrial order for the duration of the petitioner's sentence.

The order did not include any provision for the petitioner's placement in solitary confinement. It was not characterized as part of the petitioner's sentence on his criminal convictions, nor did it provide petitioner with notice of the order, or an opportunity to be heard. Notably, the respondent Justice did not articulate any statutory authority for issuing such an order.

The next day, March 14, 2006, the petitioner was sentenced[2] and placed in the custody of DOCS. Subsequently, while in custody, the petitioner continued his practice of filing false liens in violation of the March order. The petitioner also used another inmate's name to mail letters. This is a prison disciplinary offense known as "kiting." After a hearing officer at the prison sustained the charges against the petitioner for kiting the letters, he was placed in solitary confinement in the prison's segregated housing unit.

Following an automatic administrative hearing held on September 11, 2006, DOCS was notified that regulations regarding placement of inmates in solitary confinement only allow for such placement where the inmate poses a threat or danger to the safety or security of the facility. DOCS then informed the respondent Justice that it could not effectively enforce the court's March order unless it had a directive from the court to place the petitioner in solitary confinement, and it filed an application for a supplemental order providing it with such authorization.

On September 29, 2006, the respondent Justice granted the application. She issued the order ex parte without a hearing.

---

**2.** The petitioner was sentenced to three consecutive terms of 2 to 4 years for the six felony counts, and one year for the misdemeanor count, to run concurrently with the felony sentence.

She stated, however, that it would be entered without prejudice to a defense motion for vacatur or modification. The order directed, inter alia, that:

> "DOCS shall take such steps that it deems necessary, including placement of this defendant in restrictive housing, in order to limit his ability to have contact with other inmates through whom he may attempt to send out additional correspondence or whom he may convince to write to other persons on his behalf asking them to send out impermissible materials on his behalf."

Citing her "inherent power" to issue such an order, the respondent Justice stated that "the restrictive confinement ordered herein is essential to that order [the March order] being carried out." The order was modified by the court on December 5, 2006 to allow the petitioner to contact his attorney.

On December 11, 2006, the petitioner brought an order to show cause, seeking vacatur and modification of the March and September orders, on the grounds that the court exceeded the permissible scope of its jurisdiction and authority when it decided to retain control over petitioner's case after pronouncing sentence. The motion was denied, and the instant article 78 proceeding ensued.

The petitioner argues that the respondent Justice lacks jurisdiction to issue orders after petitioner's sentencing. He further argues that the respondent Justice did not have the authority to direct DOCS to enforce the March order and, in doing so, improperly relied on the court's inherent power.

The Attorney General, appearing for the respondent Justice, argues that the March order was lawful and that she therefore had the inherent authority to do what is reasonably necessary to enforce its provisions by way of the September order. The Attorney General also maintains that DOCS had no plenary rule and that the situation she was presented with was best handled by an ad hoc court order.

For the reasons set forth below, we grant the petition.

As a threshold matter, it should be noted that the majority and dissent agree that the extraordinary remedy of prohibition is available under the circumstances of this case. Where a court acts or threatens to act either without jurisdiction or in excess of its authorized powers in a proceeding over which it has jurisdiction, the extraordinary remedy of prohibition lies. (*Matter of Pirro v Angiolillo*, 89 NY2d 351, 355 [1996].)

The dissent also appears to agree that the respondent Justice exceeded the permissible scope of her jurisdiction and authority when she decided to retain control over the petitioner's case after pronouncing sentence. Indeed, it is clear that the respondent Justice did not possess the requisite statutory authority to issue the September order which sought to dictate the conditions of the petitioner's confinement. It is beyond cavil that a criminal action "terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case." (CPL 1.20 [16] [c].) The Criminal Procedure Law explicitly prohibits postjudgment interference by trial courts unless the court is specifically authorized by law to do so. (CPL 430.10.) Thus, absent a specific authorization by law, a trial court loses its authority to alter or dictate the terms of a defendant's sentence or confinement once such sentence has commenced. (*See Matter of Van Deusen v Zittell*, 88 AD2d 736, 736 [3d Dept 1982] [granting article 78 petition against County Court judge, explaining that "(o)nce petitioner commenced serving his sentence, the court was powerless to interrupt it unless specifically authorized by law to do so"].)

Here, the petitioner's criminal prosecution ended at his sentencing on March 14, 2006. At that point, the jurisdiction of the court terminated and the petitioner was under the control of DOCS. With regard to the September order, the trial court was not entitled to add new penalties to the petitioner's sentence because the sentence had already commenced.

Thus, it is uncontroverted that the trial court violated the clear proscription of CPL 430.10, and exceeded the parameter of the court's jurisdiction over the petitioner's criminal action. Significantly, neither of the respondent Justice's orders (March or September) identified any statutory basis for their authority, nor did they cite to or reference any case law supporting their issuance.

The September order did state that "this Court has the *inherent power* to issue this order" (emphasis added). Saying so, however does not make it so. It is well settled that inherent power is an extremely narrow, carefully circumscribed doctrine. (*See Matter of Kisloff v Covington*, 73 NY2d 445, 450-452 [1989] [rejecting the idea that a trial court can invoke its inherent authority to reenter a case, postsentencing, as it sees fit].)

Inherent power should rarely be exercised because it is not subject to direct democratic controls and thus, there is a danger

that such power might be wielded arbitrarily or in doubtful cases. (*Gabrelian v Gabrelian*, 108 AD2d 445, 454 [2d Dept 1985], *appeal dismissed* 66 NY2d 741 [1985].) A court's ability to exercise inherent power is very limited during the pendency of a case, and the court's ability to invoke it after judgment is even more limited. While a case is pending, "gray area situations" may require a court to act in the absence of explicit authority, "so that the adjudicative process can function." (*People v Green*, 170 Misc 2d 519, 523, 524 [Sup Ct, Bronx County 1996] [citation and internal quotation marks omitted] [where the court invoked its inherent authority during the course of a pending trial in order to permit testimony at trial].) After a criminal action has terminated by entry of judgment, a court's exercise of inherent authority is scarcely permitted. (*See Matter of Kisloff v Covington*, 73 NY2d at 452 [1989] [finding that the entry of judgment foreclosed a trial judge from subsequently correcting the sentence, despite its conceded illegality].)

The central question in evaluating the use of inherent powers postjudgment is whether "the application [to the court] seeks new relief not originally contemplated or intended." (*People v Garris*, 159 Misc 2d 586, 590 [Dist Ct, Nassau County 1993].) If the court's function in exercising its authority is essentially ministerial in nature, such action is a permissible use of inherent powers. (*Id.* at 589 [noting that the court retains the inherent power to correct errors, omissions and oversights made at the time of issuance of its records and judgments in the furtherance of justice]; *see also People v Minaya*, 54 NY2d 360, 364-365 [1981], *cert denied* 455 US 1024 [1982] [where court misspoke in pronouncing shorter sentence than that agreed upon by parties, inherent power permitted postjudgment correction].) In contrast, if the court is being asked to impose new restrictions or grant new relief to a party, it cannot do so because those functions lie beyond the realm of its permissible postjudgment activity. (*See People v Medina*, 35 AD3d 163, 164 [1st Dept 2006], *lv denied* 8 NY3d 925 [2007] [holding that in the absence of such factors as clerical error, inadvertence and fraud, a court's power to correct a substantively illegal sentence is purely statutory].)

Here, the invocation of inherent authority occurred postjudgment. (*See People v Green*, 170 Misc 2d 519 [Sup Ct, Bronx County 1996].) Since the petitioner had been sentenced and the case had ended with entry of judgment, the court's ability to

invoke the doctrine of inherent authority was essentially limited to correcting ministerial defects and fraud. In light of the fact that the September order sought to impose an additional punishment (solitary confinement) upon the petitioner after judgment had been entered, the respondent Justice's exercise of inherent power was inappropriate and without legal authority.

It appears that the dissent, as well as the respondent Justice, recognize the foregoing. Certainly, the dissent recognizes the narrowness of the inherent authority doctrine and acknowledges the fact that "the order was not issued during the pendency of the case, and was geared toward performing a responsibility which we would expect to have been performed by DOCS." It is also clear that the respondent Justice is aware that no legal authority exists for the order. None is cited. Instead, the respondent Justice retreats to phrases like "no other option" and "highly unusual" to justify the order.

While it is true that harassment of public servants in the manner done by the petitioner is obnoxious, the remedy cannot be to "stretch" the concept of inherent power especially when it is invoked as a means to deal with prospective conduct. The order to place the petitioner in solitary confinement was intended as a means of preventing the petitioner from "kiting" or using his fellow inmates to send out false filings. Yet, it is a bedrock principle of our justice system that incarceration to *prevent* crime is not permitted prior to a criminal conviction; only a guilty individual can be punished. To allow the court to place the petitioner in solitary confinement because it believes that the petitioner *intends* to commit further harassment is repulsive and contrary to the whole foundation of our penal system. Our laws punish for past offenses, rather than incarcerate a person to prevent future offenses. (*Commissioner of Community Dev. of City of Rochester v Gray*, 186 AD2d 1076 [4th Dept 1992] [finding that it was error for a court's contempt order to provide that future noncompliance will be punished, without further application to the court]; *see also Commonwealth v Truesdale*, 449 Pa 325, 296 A2d 829 [1972] [taking note of the fact that a person cannot be punished for future conduct, since he can hardly be held responsible for an act not yet committed].)

To the extent that DOCS expressed an inability to prevent the petitioner from mailing false filings, there are alternative and proper means of addressing the issue. Indeed, there is nothing to prevent the District Attorney from prosecuting the petitioner anew if he continues the harassment of public of-

ficials by false filings. However, because there was no statutory or inherent authority to support the issuance of either the March or the September order, the orders operated as an unlawful mechanism to control the petitioner's future actions after conviction.

Accordingly, the petition brought pursuant to CPLR article 78 seeking to vacate and set aside orders of the Supreme Court, New York County (Arlene D. Goldberg, J.), entered on or about March 13, 2006, September 29, 2006, December 5, 2006 and February 15, 2007, should be granted, and it is directed that petitioner be released from indefinite confinement in the special housing unit of Wende Correctional Facility.

SAXE, J.P. (dissenting). This CPLR article 78 proceeding raises the question of whether a trial court possesses the authority, postsentencing, to direct the Department of Correctional Services (DOCS) to take the necessary measures to ensure that a convicted criminal defendant will be unable to continue victimizing targeted members of the public and the justice system while he is incarcerated. I would hold that where a clear showing has been made that the inmate will continue, while in custody, his longstanding criminal practice of mailing fraudulent financial filings, falsely naming members of the public as debtors, thereby wreaking substantial havoc in each of these people's lives, and where DOCS takes the position that it is unable to prevent him from continuing this practice with the use of inmate-accomplices, the court must have the authority to protect its own integrity, and to protect the public from further victimization. It can only do so if it has the ability to direct DOCS to take such steps as are necessary to ensure that protection. This must include the authority to direct that the inmate whose crimes cannot otherwise be stopped be housed in a segregated housing unit, and other necessary protective measures. Because a showing of such unchecked ongoing criminality was made here, I would not disturb the court's assertion of authority.

### Facts

Petitioner Jovan Fludd is an inmate currently serving three consecutive terms of 2 to 4 years' imprisonment in the custody of the New York State Department of Correctional Services. He was tried and convicted on January 20, 2006 of three counts of offering a false instrument for filing in the first degree (Penal Law § 175.35), three counts of falsifying business records in the

first degree (Penal Law § 175.10), and one count of obstructing governmental administration in the second degree (Penal Law § 195.05), and sentenced by respondent Justice on March 14, 2006. These convictions were based upon petitioner's actions— undertaken while in prison on a prior conviction—involving the filing of UCC-1 financing statements falsely naming as debtors various prosecutors, judges, clerical staff, court reporters and defense counsel who had been involved with prior prosecutions against him.

Apparently, making such false filings is a practice employed with some regularity by inmates, criminal defendants and disgruntled litigants against public officials as a means of harassment (*see United States v Gordon*, 2005 WL 2237640, *1-2, 2005 US Dist LEXIS 20737, *3-5 [SD Ga 2005]; *Hudson v Caruso*, 2005 WL 1689640, 2005 US Dist LEXIS 22645 [WD Mich 2005]; *United States v Brum*, 2005 WL 1606584, 2005 US Dist LEXIS 21208 [ED Tex 2005]; *United States v Orrego*, 2004 WL 367706, 2004 US Dist LEXIS 28608 [ED NY 2004]). Although these baseless filings are not legally effective to create an enforceable lien (*see United States v Rodriguez Ramirez*, 291 F Supp 2d 266, 269 [SD NY 2003]), and indeed, the filer may be subject to civil and criminal sanctions and penalties (*see* UCC 9-509 [a]; 9-625), nevertheless a record of the filing exists in the public database. Since there appears to be no means for the victim of a bogus lien to completely remove or expunge the unauthorized UCC-1 statement, the filing, though false, may be found by an entity conducting a lien search, and may interfere with the named individual's ability to obtain credit or conduct other financial affairs such as the purchase and sale of property (*see United States v Gordon*, 2005 WL 2237640, 2005 US Dist LEXIS 20737, *supra*).

On May 19, 2005, based upon a clear and convincing showing of petitioner's repeated and continuing pattern of falsely filing such financial statements while in custody, the arraignment justice (Ambrecht, J.) granted the People's application for an order imposing conditions on petitioner's incarceration. The order prohibited petitioner from filing UCC-1 statements or other specified UCC forms, or other civil litigation (except habeas corpus petitions) without leave of the court, and further limited his ability to make telephone calls, send letters, give materials to visitors, and obtain funds from his commissary account; it also provided for appointment of a Special Master to monitor petitioner's correspondence. By its terms, the order would remain in effect during the pendency of the criminal case.

Following petitioner's conviction on January 20, 2006, and prior to his sentencing on March 14, 2006, the People sought a new order continuing the specific terms of petitioner's incarceration, in the interests of protecting the witnesses who testified in the case, the public servants involved in the prosecution, and the jurors. On March 13, 2006, in the context of the criminal prosecution, respondent Justice issued the requested order, containing similar provisions to those of the prior order.

After he was sentenced and committed to the custody of DOCS, petitioner continued his practice of attempting to use the mails to injure any individuals who took part in his prosecution. When this was prevented by the screening of his own mail by the court-appointed Special Master, he attempted to continue the practice by using other inmates, whose names were used for the envelopes' return addresses, to mail a number of letters seeking information against seven judges, three assistant district attorneys, and his defense counsel. When these actions were uncovered, petitioner was found guilty of the disciplinary offense known as "kiting" following hearings held on August 2, 2006 and August 8, 2006.

In September 2006, officials at the correctional facility placed petitioner in the prison's segregated housing unit (SHU). However, following an automatic administrative hearing on September 11, 2'006, a hearing officer directed that DOCS could not continue to keep petitioner in the SHU, because applicable regulations regarding placement of inmates in segregated housing only allow for such placement where the inmate poses a threat or danger to the safety or security of the facility (*see* 7 NYCRR 301.4 [b]). DOCS thereupon informed respondent Justice that it could not effectively enforce the prior order unless petitioner was placed in restrictive confinement, but that it could not properly do so without a further directive from the court.

Confronted with the apparent helplessness of DOCS to prevent its inmates from continuing to commit this type of crime through the mails, respondent Justice therefore granted the application to issue a supplemental order. Its order, dated September 29, 2006, was denominated an order for restrictive confinement, and directed, inter alia, that

> "DOCS shall take such steps that it deems necessary, including placement of this defendant in restrictive housing, in order to limit his ability to have

contact with other inmates through whom he may attempt to send out additional correspondence or whom he may convince to write to other persons on his behalf asking them to send out impermissible materials on his behalf."

This order was thereafter modified by the court on December 5, 2006, to respond to protests by appellate counsel that the foregoing orders prevented attorney-client communications, by making provision for mail to be sent and telephone calls made by petitioner to counsel.

Assigned appellate counsel brought an order to show cause on December 11, 2006, seeking vacatur and modification of the March and September orders, on the ground that the court lacked jurisdiction to issue the order of September 29, 2006, and that the March order was unlawfully restrictive. That motion was denied by decision and order dated February 15, 2007, the court noting that it had taken pains to avoid ordering DOCS to take any particular steps, and that any claim of denial of due process or other violations in his treatment while imprisoned was reviewable through article 78 proceedings against DOCS and the correctional facility.

The instant article 78 proceeding ensued, in which petitioner named as respondents the issuing Justice, the New York County District Attorney, the Commissioner and Counsel for the Department of Correctional Services, and the Superintendent of the correctional facility housing petitioner.

## Discussion

As the majority holds, an article 78 proceeding is the appropriate vehicle to challenge the court's assertion of continued authority over petitioner following conviction and sentencing, inasmuch as an appeal would be from the conviction itself, and the issue raised here is the court's jurisdiction to issue the challenged orders.

Further, it is true that there is no statutory basis for the court's assertion of jurisdiction. The Criminal Procedure Law provides that a criminal action "terminates with the imposition of sentence or some other final disposition in a criminal court of the last accusatory instrument filed in the case" (CPL 1.20 [16] [c]). Postjudgment interference in the sentence is prohibited "[e]xcept as otherwise specifically authorized by law" (CPL 430.10). Circumstances in which a trial court continues to exert authority over a case after sentencing are normally limited to

those where a statute so provides, such as where the defendant was sentenced to a term of probation or a conditional discharge (CPL 410.20 [1]; 410.50; *see also People v Panesga*, 160 Misc 2d 1063, 1067 [1994]).

In *People v Purley* (297 AD2d 499 [2002], *lv denied* 99 NY2d 503 [2002]), this Court reversed a supplemental order issued by the sentencing court, in which the Department of Correctional Services had been directed to implement specific measures concerning the medical care of the defendant during his incarceration. We observed that once a court commits a defendant to the custody of DOCS, thereafter, "prison services, including health care, are the responsibility of DOCS (*see* 9 NYCRR 7600.1 *et seq.*)" (*id.* at 501). Similarly, it has been held that the trial court has no authority to order DOCS to commit a convicted criminal defendant to a specific correctional facility (*see* Correction Law §§ 23, 71; *see also People v Sass*, 182 AD2d 861 [1992], *lv denied* 80 NY2d 837 [1992]).

Yet, faced with DOCS's protestations that it lacked the regulatory authority to take the steps necessary to prevent its own inmates from continuing petitioner's criminal conduct while incarcerated, respondent Justice understandably, and appropriately, looked to the court's inherent powers to remedy this incomprehensible failure of responsibility.

The concept of the inherent power of the court is an assertion of authority which "must be invoked with great restraint," because it is not subject to direct democratic controls (*Gabrelian v Gabrelian*, 108 AD2d 445, 454 [1985], *appeal dismissed* 66 NY2d 741 [1985]). Such power should only be exercised "when a Judge must discharge a responsibility, but lacks guidance from explicit legislative or decisional authority" (*Alvarez v Snyder*, 264 AD2d 27, 35 [2000], *lv denied* 95 NY2d 759 [2000], *cert denied sub nom. Diaz v Snyder*, 531 US 1158 [2001]).

The court's inherent powers have previously been held properly relied upon in circumstances where it had to take action in the absence of explicit authority, during the pendency of a case, "so that the adjudicative process can function" (*People v Green*, 170 Misc 2d 519, 524 [1996] [citation and internal quotation marks omitted]). This reasoning was used by this Court in *Alvarez v Snyder* to uphold a series of lockdown orders issued by a trial judge in the context of pending indictments against multiple defendants, with the recognition that the court, having responsibility for avoiding any interference with pending cases, has an inherent power "governed by the need to reasonably en-

able a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective" (264 AD2d at 35).

Of course, here, the order was not issued during the pendency of the case, and was geared toward performing a responsibility which we would expect to have been performed by DOCS. Decisions regarding an inmate's imprisonment are the responsibility of DOCS (*cf. People v Purley*, 297 AD2d at 501). Indeed, DOCS, and specifically its use of special housing units, is covered by a wide array of regulations regarding inmate misconduct (*see* 7 NYCRR ch VI). The challenged orders were sought and issued only when DOCS had reported that it lacked the authority to take the actions necessary to prevent the continued criminal conduct it had found to be taking place.

Respondent Justice was presented with a complete vacuum of authority, in the face of findings made both by herself and by DOCS that petitioner had the intent, the means and the ability to arrange for his criminal misconduct to continue, if not by his own hands then through his fellow inmates. Petitioner, by his continued conduct, was not only thumbing his nose at our system of justice, he was in fact wreaking havoc with that system, by successfully creating an ongoing threat to every individual who crossed his path in the course of his prosecutions, possibly making people hesitate to carry out their assigned tasks in his cases. Respondent Justice was therefore presented with a Hobson's choice; she really had no other option than to invoke the inherent authority of the court. If she declined to do so, and by inaction allowed an inmate convicted of this type of crime to continue the same conduct during his years of incarceration, against scores of new victims, the court would in very short order be hobbled in its performance of its judicial functions.

Furthermore, we should consider that a convicted and imprisoned defendant who is enabled to continue to commit, while in custody, the very same crime for which he was convicted, is not really being punished, or serving the sentence, as was contemplated. Where that is the case, the assertion of the court's inherent power to remedy the situation may be unusual, but it is not unjust.

The majority suggests that the proper manner of handling this situation is to prosecute petitioner for each additional false filing. While it is irrefutable that petitioner should be prosecuted for each crime, that course of conduct will do nothing to prevent petitioner's continued criminal conduct while in prison.

It would merely lengthen the time he would spend in prison, and widen the circle of victims on whom to make renewed attacks with increasing vigor. What is necessary is to prevent petitioner from continuing the same criminal conduct while he is in the custody of DOCS. If DOCS understands itself to be so powerless as to be unable to prevent this, and if the court system is unable to prevent it as well, petitioner will have succeeded in making a mockery of our justice system.

This assertion of inherent authority in such circumstances is admittedly unique. However, it arises in the context of a highly unusual dilemma. The only other way to avoid this problem in the future would be to ensure that the governing regulations regarding the handling of DOCS inmates authorize the Department to provide the necessary protection to the public from the types of crimes petitioner has continued to commit while in custody, using fellow inmates as accomplices. A modification or clarification of those regulations ought to be adopted, sufficient to protect the public from victimization by continuing criminal conduct on the part of prison inmates.

NARDELLI and SWEENY, JJ., concur with CATTERSON, J.; SAXE, J.P., and GONZALEZ, J., dissent in a separate opinion by SAXE, J.P.

Petition brought pursuant to article 78 of the Civil Practice Law and Rules seeking to vacate and set aside orders, Supreme Court, New York County, entered March 13, 2006, September 29, 2006, December 5, 2006 and February 15, 2007, granted, and it is directed that petitioner be released from indefinite confinement in the special housing unit of Wende Correctional Facility.